# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KYLE LAUKUS, | ) | CASE NO.  5:07CV2331 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| RIO BRANDS, INC. et al, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

The Court takes no pleasure in issuing this ruling on defendants' pending motion for sanctions. According to plaintiff, this matter can be reduced to nothing more than "an honest mistake" by counsel involving an "inadvertent failure to timely produce a document." (Doc. No. 330, Plaintiff's Post-Hearing Brief at 10233.) Plaintiff suggests that the facts that caused defendants to seek sanctions involve "an unfortunate perfect storm of circumstances, culminating in the belated production of the [previously undisclosed] Receipt." (Plaintiff's Post-Hearing Brief at 10233.) The Court wishes this were true. Unfortunately, the facts tell a much different story. What started with the discovery of one previously undisclosed document has led to the unearthing of compelling evidence that plaintiff:

- intentionally gave false testimony in his deposition on a central issue in the case;

- knowingly verified false and misleading discovery in order to unjustly bolster his claims;

- failed to correct or supplement discovery responses he knew to be inaccurate;

- failed to correct material arguments made by his counsel in this Court and on appeal that he knew were false; and

- failed to prosecute this case in good faith by repeatedly withholding material evidence.

The Court also finds that each of plaintiff's three primary litigation counsel:

- knowingly offered (or allowed to be offered) vague and evasive discovery responses designed to thwart defense counsel's ability to engage in meaningful discovery;

- knowingly offered (or allowed to be offered) arguments before this Court and on appeal that were not supported by—and contrary to—the record;

- failed to make a reasonable effort to discover and produce evidence responsive to discovery requests;

- failed to correct discovery responses they knew to be inaccurate, misleading or false; and

- failed to correct deposition testimony offered by their client that they knew to be false.

These disturbing findings have led the Court to conclude that only the most serious of sanctions is appropriate, namely, the dismissal of plaintiff's claims with prejudice and an award of attorney's fees to defendants.

         The Court now sets about the task of providing context for defendants' sanctions motion and support for the Court's findings of fact and conclusions of law. In 2007, plaintiff brought this service mark action against defendants, alleging that defendants had infringed upon his service mark "American Pride." Nearly five years later and over four years after discovery had closed, plaintiff sought to have one of his attorneys of record in the litigation, Richard Martin, serve as a fact witness at trial. In order to accommodate this rather unusual request, the Court permitted Martin to

withdraw as counsel. Thereafter, within weeks of trial, defendants deposed Martin. In connection with the notice of deposition, defendants issued a subpoena *duces tecum* for Martin to produce documents in his possession relating to the underlying service mark action. Included in the 81 pages of documents Martin produced in response to the subpoena was a copy of a June 1, 2004 receipt for a flag pole kit that plaintiff had purchased from a Lowe's store in Michigan. Though responsive to several discovery requests, the receipt was never produced by plaintiff.

The belated production of this one document, years after the close of discovery, has turned the present litigation on its head. The receipt suggested that plaintiff was aware of defendants' alleged infringement nine months earlier than defendants had been led by plaintiff to believe. The date of the purchase was significant, as laches was a critical issue in the case. Because plaintiff failed to disclose the June 1, 2004 date of the purchase of the allegedly infringing product, defendants necessarily had to rely on a much later date advanced by plaintiff. The existence of the receipt also called into question the veracity of plaintiff's discovery responses and his deposition testimony, and led to the discovery of other evidence that had not been produced, or at least identified, in discovery. [1]

Defendants have filed a joint motion seeking the dismissal of the present action, along with fees and expenses, as a sanction for alleged discovery misconduct by

---

[1] The receipt, itself, contained a wealth of information. In addition to language showing that the sale took place on June 1, 2004 at the Lowe's store in Benton Harbor, Michigan, the receipt also contained: the time of the sale, 15:15:52 (3:15 PM); the message "THANK YOU KYLE LAUKUS FOR SHOPPING LOWE'S" in typeface; and plaintiff's handwritten notation, "This is not for the photo copy page—email pictures." (Doc. No. 320-2.) The parties agree that this purchase was made by plaintiff on the date and time indicated on the receipt, and that the handwritten note was also made by plaintiff. (Doc. No. 323-1, Plaintiff's Affidavit at 9712; Doc. No. 315-1, Martin Deposition, TR at 9428.)

plaintiff and his attorneys, which, defendants insist, includes withholding and concealing highly material and prejudicial evidence. (Doc. No. 319.) Plaintiff opposes the motion (Doc. No. 323), and defendants have filed a reply (Doc. No. 324). On September 19, 2012, the Court conducted an evidentiary hearing on the motion. Following the hearing, the Court permitted the parties to file simultaneous post-hearing briefs. (Doc. Nos. 330, 331.) The trial in this matter, previously scheduled to begin August 27, 2012, was continued pending resolution of the sanctions motion.

## I. FACTUAL BACKGROUND

To understand how the appearance of this one document four years after the close of discovery has completely called into question the integrity of the entire proceedings, it is necessary to go back to the beginning, or at least to what defendants and the Court believed to be the beginning. Though the import of the following facts is contested, the parties now agree as to how these facts unfolded.

### A. *The Service Mark and Rio's Use of the Mark*

It is undisputed that plaintiff Kyle Laukus owns a service mark for the use of the name "American Pride" for "retail store services in the field of flags, flag poles, pennants and streamers, in class 42 (U.S. C.L. 101)." (Doc. No. 45-2, Second Am. Compl., Ex. B, Registration No. 1,690,681.) It is also beyond dispute that defendant Rio Brands, Inc. ("Rio") previously manufactured and sold flag pole sets under the trademark "American Pride." (Doc. No. 84-1, Ex. A, Declaration of Warren Cohen at 995.) Rio never operated a retail store or directly sold its products to consumers. Rather, it relied on

4

"big box" retailers, such as defendants Wal-Mart, Sam's Club and BJ's (collectively "retail defendants"), to sell its products.

On February 28, 2005, Laukus's pre-litigation counsel, Brian McMahon, sent Rio a letter demanding that Rio end its use of the mark "American Pride" in the sale of flag pole kits or any other similar products. (Doc. No. 95-7.) In a letter dated March 11, 2005, counsel for Rio responded to the cease and desist letter by denying any trademark infringement on the part of Rio, noting that Laukus's registered mark was for use in retail services, an activity in which Rio was not engaged. (Doc. No. 84-10.) The letter gave every indication that Rio would continue to use the "American Pride" mark to market its flag kits to the big box retailers.

Laukus filed the present lawsuit on July 31, 2007, more than two years and five months after McMahon sent the cease and desist letter to Rio's counsel. (Doc. No. 1, Compl.) In his second amended complaint, Laukus raised claims for federal and common law trademark infringement, trademark counterfeiting, unfair competition under Ohio Rev. Code § 4165.02, and unjust enrichment. (Doc. No. 45.) Defendant Rio filed a counterclaim for cancellation of plaintiff's service mark. (Doc. No. 54, Answer to Second Am. Compl.)

From the beginning, the defense of laches—plaintiff's delay in bringing suit—was front and center in this litigation. (*See*, *e.g.*, Doc. No. 328, Sanctions Hearing Transcript, TR at 10073 [wherein one of plaintiff's counsel, Joseph Dattilo, admitted that "Right from the very, very beginning we understood that the presumption [regarding

laches] was with them"].)[2] In denying plaintiff's motion for a temporary restraining order and preliminary injunction, the Court relied, in part, on plaintiff's delay in bringing suit. (Doc. No. 10, Memorandum Opinion at 324-25.) Following the denial of injunctive relief, defendants filed answers to the complaint, raising laches as an affirmative defense. (Doc. No. 17, Wal-Mart's Answer at 429; Doc. No. 23, Rio's Answer at 453.)

### B. Discovery on the Subject of Laches

Laches also played a prominent role in discovery, as defendants sought information concerning when plaintiff first learned of Rio's use of the "American Pride" mark. For example, defendants propounded the following discovery requests:

- <u>Wal-Mart Doc. Request No. 40</u>: Produce all documents, things and electronically stored information concerning all investigations regarding any use of the words AMERICAN PRIDE.

- <u>Wal-Mart Doc. Request No. 58</u>: Produce all documents, things and electronically stored information concerning any alleged pre-filing investigation conducted by Laukus in this lawsuit.

- <u>Wal-Mart Interrogatory No. 4</u>: Identify each and every use of the words "American Pride" by any person(s) or entity(ies) other than You and, for each such use, identify the location where such use occurred, the date(s) of such use, any documents associated with such use, and all persons having knowledge of such use.

- <u>Rio Brands Doc. Request No. 17</u>: All documents concerning any of the activities of Defendants herein for which Plaintiff seeks redress.

- <u>Rio Brands Doc. Request No. 30</u>: All documents concerning Plaintiff's knowledge of the use by others of the mark AMERICAN PRIDE in association with goods and/or services.

While the June 1, 2004 receipt and the underlying 2004 purchase of the allegedly infringing product by plaintiff were responsive to these requests, neither the receipt nor

---

[2] Unless otherwise noted, all "TR" references are to the transcript from the sanctions hearing, held on September 19, 2012.

the flag kit was ever produced in discovery, nor was any mention of the specific date of underlying purchase ever disclosed.

Instead, plaintiff's verified responses to these discovery requests left the unmistakable impression that plaintiff only learned of the alleged infringement shortly before the February 2005 cease and desist letter was sent. For example, in response to an interrogatory directing plaintiff to identify all instances of actual confusion between defendants' alleged use of the words "American Pride" and plaintiff's protected right to the words, plaintiff identified a single instance, in 2005, when his local postmaster advised him that he saw what he believed to be plaintiff's flag pole kit in a Lowe's store. The flag kit in question had actually been manufactured by Rio.

Plaintiff was deposed on two separate occasions: March 10, 2008 and July 22, 2008. (Doc. Nos. 280, 281.) When asked how he first became aware of Rio's use of the mark, plaintiff repeated the story that he received a tip from the postmaster.[3] (Doc. No. 280, Plaintiff Dep. TR at 6093-94.) Plaintiff further testified that he immediately went to Lowe's to purchase a flag, and then set about the task of seeking counsel to take action against Rio. (Plaintiff Dep. TR at 6095-6100.) When asked when the purchase took place, he responded, "Dates are my worst memory subject, so trying to pinpoint dates is difficult. It's got to be about two and a half, three years ago something like that,

---

[3] Specifically, plaintiff testified:

> The local post office was a daily event for me to go there and it's a small one so I was very friendly with the postmaster, the people that work there, and they knew my business, selling flags, and American Pride was my company name.

> One day the postmaster says it looks like you hit the big time, huh, and I said I'm not sure what you're talking about, Dave. And he said, well, I saw your flag kit over in Lowe's, and I said you did, and he said yes, American Pride, stars and stripes, just like your business cards and the truck.

7

and I'm not positive on that." (Plaintiff Dep. TR at 6094-95.) His testimony (which took place in March 2008) placed the sale in early 2005.

Plaintiff was also asked a question about a document identified in a privilege log that had been prepared by John Skeriotis, one of his attorneys from the law firm of Brouse McDowell. The log, which (at that point in time) contained a mere eight entries, identified an email from Kyle Laukus to Antigone Delaney, dated June 1, 2004 (now known to be the actual date of the Lowe's purchase), with the descriptor "AMERICAN PRIDE Trademark Matter." (Doc. No. 324-1.) In response to a question regarding the nature of the conversation between him and Delaney, plaintiff testified that Delaney was an attorney with a law firm in Washington, DC, who had contacted him on an unrelated matter involving his sale of coffee. Laukus explained:

> I had asked her what their fees were and how much they would charge if I ever needed them. She was the initial contact about the coffee issue and asked me to cease and desist, so since they were dealing with trademarks I just contacted them for information of what their firm would be capable of doing if I ever needed them.

(Plaintiff Dep. TR at 6220-21.) Plaintiff gave no indication that he and Delaney may have discussed what he believed was Rio's infringement of his mark.

Although perhaps frustratingly vague, on its face, plaintiff's deposition testimony would not have raised any obvious red flags regarding the date plaintiff first became aware of the alleged infringement. It was consistent with his responses in written discovery that he first learned about Rio's alleged infringing sales in 2005 when he received the tip from the local postmaster. The fact that he had contacted a trademark attorney in 2004 was also explained away by the unrelated trademark matter involving a prior business venture (in which plaintiff had received a "cease and desist" letter), and

8

plaintiff's professed general inquiry into the virtues of employing trademark counsel. That plaintiff had not produced any documentation memorializing his purchase of the offending flag from Lowe's also raised no red flags as plaintiff had repeatedly, and consistently, maintained that most of the documents relevant to the present litigation had been seized by the government or misplaced by his former wife.[4] As it turned out, the 2005 date was not accurate. In actuality, plaintiff had made his purchase much earlier and he and his attorneys possessed undisclosed evidence that would have revealed this material information.

### C.  Summary Judgment on the Issue of Laches

In accordance with the Court's Case Management Plan and Trial Order, non-expert discovery was completed by July 18, 2008. (*See* Doc. No. 32; Minute Order, dated February 26, 2008; Doc. No. 89.) The parties proceeded to summary judgment, wherein defendants argued that plaintiff's claims for past damages were barred by laches. Based upon plaintiff's responses to written discovery and his deposition testimony, all parties used the February 28, 2005 date of the McMahon cease and desist letter as the date on or around when plaintiff first learned of Rio's use of the mark. (*See* Doc. No. 136, Plaintiff's Opposition Brief at 1945 [wherein plaintiff argues, "Even using the defendants' calculations (which start with the February 28, 2005 cease-and-desist letter),

---

[4] Plaintiff testified that his former wife, Renee Laukus, had maintained many of the business records for his company during their marriage, and that only she knew their location. (Plaintiff Dep. TR at 6056-57.) Plaintiff explained that, following Renee's departure, he had searched his office but could not locate these records. (Plaintiff Dep. TR at 6091.) Further, according to plaintiff, Renee's then-current whereabouts were unknown. With respect to his tax records, plaintiff stated that the IRS had seized his accountant's files when the accountant was arrested and, for this reason, most of his tax records were also unavailable. (Plaintiff Dep. TR at 6145.)

the delay is *at most* five months beyond the two-year limitations period"], emphasis in original.)

The Court granted defendants summary judgment, finding that plaintiff's claims for damages for past infringement were barred by laches. (Doc. No. 137.) Noting that the analogous Ohio statute of limitations was two years, the Court found that plaintiff's delay of two years and five months created a presumption in favor of laches. The Court further found that plaintiff's dubious evidence of due diligence in protecting his rights did not rise above the level of a scintilla such that it created any genuine issues of material fact sufficient to overcome the presumption of laches. Following the Court's subsequent ruling on the remaining claims, the parties sought a final judgment from the Court under Rule 54(b) of the Federal Rules of Civil Procedure, and plaintiff filed an appeal.

### D.  Proceedings before the Sixth Circuit

The Sixth Circuit scheduled the matter for oral argument. In considering this Court's grant of summary judgment and assessing whether Laukus had "good cause" for his delay, a panelist asked one of plaintiff's lead counsel, Joseph Dattilo of Brouse McDowell, whether plaintiff, a Michigan resident, could have reasonably relied on Michigan's longer three-year statute of limitations:

> Sixth Circuit—"Counsel if you had filed this in Michigan where your client does business you wouldn't have any problems, would you?"

> Mr. Dattilo—"No, that's, that's corre-well, there would be-the presumption would go the other way, your Honor. That's correct. So three-year analogous statute in Michigan."

10

> <u>Sixth Circuit</u>—"Alright. In determining whether your client is guilty of laches, which is inequitably sitting on his rights, should we take into account that he is in Michigan and that I, I assume he probably knows, if, if he actually looks at the law, that he's got three years in Michigan? I mean he, he's probably assuming his rights are governed by where he is."
>
> <u>Mr. Dattilo</u>—"I, I think that that's correct your Honor, that that would be an issue that goes into his reasonable belief. And-."
>
> <u>Sixth Circuit</u>—"Well, should we factor that in? I guess."
>
> <u>Mr. Dattilo</u>—"I, I believe it should because it goes to what is reasonable in his circumstances and how is his . . . ."

(Doc. No. 320-8, DVD, beginning at 2:18.) Of course, the June 1, 2004 receipt placed the purchase of the flag kit outside the longer Michigan three-year statute of limitations. Moreover, Dattilo testified at the sanctions hearing that his client did not factor in the three-year Michigan limitations statute. (TR at 10072.)

Dattilo capitalized on another opportunity to massage the facts in his client's favor during oral argument when he was asked about this Court's finding that plaintiff let several "flag selling seasons" expire before he made any effort to investigate whether his mark was being infringed by defendants. Specifically, counsel was asked:

> <u>Sixth Circuit</u>—"Before you leave, one more question. They, they argue that your due diligence search to see if, uh, Rio was selling the flags with 'American Pride', uh, was not diligent because it was conducted during the non-flag selling season, during the Fall, I think, it was, 2006. And, that you should have known that, of course, Wal-Mart doesn't sell flags during the non-flag selling season. How do you respond to that argument?"
>
> <u>Mr. Dattilo</u>—"We respond to that, that when we first found the flags it was in February of 2005 during the—quote unquote—'non-flag selling season.' They were there. And they're there, and, and, and you can go at any point in time and you will see American Flags there. And we looked."

11

(DVD, beginning at 10:41.) Of course, contrary to Dattilo's representation to the circuit court, the June 1, 2004 purchase of the flag kit occurred at the height of the flag-selling season.[5]

In reversing this Court's ruling on summary judgment as to the issue of laches, the Sixth Circuit appears to have materially relied upon the colloquy with Mr. Dattilo:

> Finally, had Laukus initiated this action in Michigan (his state of residence and the place of harm), his claims would have fallen well within the state's three-year statute of limitations, and he would have enjoyed a strong presumption of reasonableness in delaying suit. *See Mich. Comp. Laws* § 600.5805(10). We observe that, as the owner of a Michigan-based business, Laukus could reasonably have relied on the longer statutory period in calculating how long he could wait before asserting his claims in a court of law. The district court neglected to recognize this inference in Laukus's favor.

(Doc. No. 181, Sixth Circuit Opinion at 13174.) The Sixth Circuit also emphasized that this Court erroneously reached its conclusion as to laches "notwithstanding the fact that Laukus first discovered the infringing product during a period that fell within what the court deemed the off-season." (Sixth Circuit Opinion at 13173.)

At the risk of stating the obvious, had plaintiff and his counsel produced

---

[5] In his uncontested affidavit, Rio's President, Warren Cohen, explained that the established "flag selling season" runs from "late April through the July 4[th] holiday and generally through Labor Day . . . ." (Doc. No. 84-1, Declaration of Warren Cohen I at 996.) Plaintiff also acknowledged the existence of a "flag selling season." (*See* Doc. No. 95, Brief in Opposition to Summary Judgment at 1174, citing Doc. No. 95-3, Plaintiff's Declaration at 1880 ["When Laukus discovered that Rio's infringing activities had resumed on what seemed to be a larger scale in the spring of 2007—the beginning of the flag-selling season—he filed the present lawsuit within two months."]; Doc. No. 280, Plaintiff's Deposition I, TR at 6049 ["Just because of the flag pole business being so seasonal."].)

the June 1, 2004 receipt in discovery (and other related evidence)[6] as they were required to do, Dattilo would never have been able to rely at the Sixth Circuit on the Michigan statute in the manner in which he did, nor would he have been able to assert that the flag was discovered during the "off season," in order to bolster his client's position on laches.[7] In fact, during the sanctions hearing even Laukus's counsel conceded that he would not have made the arguments that he made if the receipt (and other undisclosed evidence) had been disclosed. (TR at 10200.)

### E.  Attorney Martin's Deposition

Upon remand, the parties engaged in extensive pre-trial activity, including the filing of numerous pre-trial motions. Among these motions was plaintiff's motion to permit Martin, who had been counsel of record since the inception of the lawsuit, to withdraw as counsel so that he could testify to the pre-litigation steps Laukus took to protect his mark. (Doc. No. 214.)  The Court conducted a hearing on this, and other, pre-trial motions on April 19, 2012. At the conclusion of the hearing, the Court granted

---

[6] Significantly, plaintiff's counsel had personal knowledge of the ease of finding the allegedly offending flags during the flag-selling season, as it was during such a period that they personally located and purchased Rio's flag kit just prior to filing the lawsuit in 2007. (A receipt found in the "privileged" documents provided to the Court at the sanctions hearing shows that Skeriotis purchased a flag on May 20, 2007 (Bates-stamp at KL-000874). Also, another of plaintiff's attorneys testified during his deposition that after months of unsuccessfully locating Rio's flag kits during the off-season, he received a call from Laukus in the summer of 2007 alerting him that "there's activity again, and [Laukus] told me that he had word that the flags were in stores, that it was season. He called it season, having to do with maybe July 4th or the summer season or whatever the heck was coming upon . . .[,]" at which point Martin went out and was able to find and purchase a Rio flag kit on June 1, 2007. (Doc. No. 315-1, Martin Deposition, TR at 9452-53.)

[7] Defendants have not cited any authority that would support a finding that this Court possesses the authority to sanction the conduct of plaintiff or his counsel on appeal and, therefore, the Court does not consider defendants' suggestion that it should consider such sanctions. The Court includes a discussion of the proceedings before the Sixth Circuit, however, because it completes the story and explains the current posture of the case. It also helps to explain the extent to which defendants have been prejudiced by the discovery misconduct before *this* Court.

Martin leave to withdraw, and further ordered Martin to be made available for deposition. (Doc. No. 306, Minute Order.)

Defendants scheduled Martin's deposition for July 24, 2012, and issued the aforementioned subpoena *duces tecum*. At his deposition, Martin testified that, in June 2006, he first learned through a mutual friend that plaintiff was attempting to engage counsel to pursue a trademark matter. (Doc. No. 315-1, Martin Deposition, TR at 9378-80.) Plaintiff contacted Martin, and sent him a stack of documents relating to the potential litigation. (Martin Dep. TR at 9381-82, 9384-85.) There is no dispute that the June 1, 2004 receipt was among the documents Martin received from plaintiff. Martin agreed to assist plaintiff in securing intellectual property counsel and began to contact firms that specialized in trademark law. It was during this time—June or July of 2006—that Martin and Dattilo crossed paths.

Dattilo and Martin were high school classmates, and Dattilo contacted Martin in 2006 regarding arrangements for a class reunion. (Martin Dep. TR at 9373.) It was at either one of the planning meetings for the reunion, or at the reunion itself, that Dattilo and Martin first discussed Laukus and his service mark case. (Martin Dep. TR at 9373, 9427-28.) While Martin had been courting another Ohio-based law firm at the time, his encounter with Dattilo convinced him that he should consider recommending Dattilo's firm, Brouse McDowell. (Martin Dep. TR at 9390-91.) Martin testified that in the fall of 2006 he gave Dattilo a copy of the material he had received from Laukus[8]

---

[8] Martin testified that he gave a similar packet of materials to Buckley King, the other Ohio-based law firm he was considering. (Martin Dep. TR at 9390-91.) This packet was sent to Buckley King on August 11, 2006. (Doc. No. 326-8, Sanctions Hearing Court Ex. 2, Privilege Log at 9946.)

(Martin Dep. TR at 9391-92), which would have included the 2004 receipt. (Martin Dep. TR at 9391 ["Whatever I [sic] information I received from Mr. Laukus was in the materials that I ultimately delivered to Brouse & [sic] McDowell, yeah."].)

According to Martin, the key to securing representation for Laukus was to find counsel willing to accept the case on a contingency basis because Laukus did not have the funds to pay a retainer. (Martin Dep. TR at 9444-45.) Martin testified that Dattilo was adamant that he would not accept a contingency fee arrangement unless the action could be filed in Ohio, and that there was proof that Rio had continued to utilize Laukus's mark locally following the 2005 cease and desist letter. (Martin Dep. TR at 9409-10, 9454-55.) It was not until counsel uncovered evidence in May 2007 (TR at 9973) that Rio had continued to use the mark in Ohio that the law firm of Brouse McDowell agreed to pursue the matter on behalf of Laukus.

During the course of the deposition, Martin was questioned about the documents he had produced in response to defendants' subpoena. Martin identified the copy of the previously undisclosed June 1, 2004 receipt and further identified plaintiff's handwriting on the copy. (Martin Dep. TR at 9428.) The record reflects that, on July 28, 2006, Martin received this and other documents from Plaintiff. (Doc. No. 326-4, Sanctions Hearing Wal-Mart Ex. A, FedEx Shipping Label at 9868; Martin Dep. TR at 9422.)

Significantly, his testimony revealed his actual knowledge and awareness of the information contained on the Lowe's receipt from plaintiff's purchase on June 1, 2004. Specifically, when he recounted the efforts he made pre-suit to locate Rio's allegedly infringing product from Lowe's, Wal-Mart, and Sam's Club, he testified he was

"more focused on Lowe's than any of them because that's the one that I knew was in the documents I had received, so I focused more on Lowe's than I did on others." (Martin Dep. TR at 9439-40.)

Martin also had actual knowledge and awareness of the significance of Delaney's June 11, 2004 engagement letter to Laukus. Although he did not refer to Delaney by name, he testified that during his pre-suit discussions with Laukus, he made reference to specific litigation costs and fee estimates contained in Delaney's letter. (Martin Dep. TR at 9444.)

### F.  Defendants' Motion for Sanctions

Following the deposition, and in accordance with the Court's local rules, the parties contacted the Court to report the discovery of previously undisclosed material evidence that had surfaced. The Court afforded the parties leave to brief the matter. In their motion for sanctions, defendants posited that plaintiff's concealment of what defendants referred to as the "smoking gun" had incurably infected the proceedings, unnecessarily delayed a final resolution of this matter, and caused defendants irreparable harm. According to defendants, the receipt not only establishes that Laukus knew of the alleged infringement for at least three years and two months before filing suit against defendants on July 31, 2007, it also serves to illuminate the fact that plaintiff and his counsel have tendered materially false discovery responses and deposition testimony, and have knowingly offered false arguments and representations in court proceedings. Defendants insist that the conduct of plaintiff and his counsel violated numerous Federal Rules of Civil Procedure.

16

In opposing defendants' motion for sanctions, plaintiff maintains that the oversight in responding to discovery was inadvertent, and has offered his own affidavit, along with those of several of his attorneys, in an attempt to explain how what he has discounted as an "unfortunate mistake" took place. (Doc. No. 323 at 9705; Doc. No. 323-1 through 323-5.) Plaintiff claims that the June 1, 2004 receipt had mistakenly made its way into an unofficial working file of an associate, Donald Firca, who left the firm of Brouse McDowell shortly after the present lawsuit was filed. According to plaintiff, the attorneys most closely responsible for discovery, Dattilo and Skeriotis, were unaware of the existence of the receipt until Martin (who was also counsel of record throughout) produced it in connection with his deposition.

### G. The Sanctions Hearing

At the sanctions hearing, plaintiff offered the testimony of Dattilo and Skeriotis. Dattilo, who (along with Martin and Skeriotis) served as lead counsel in this matter (TR at 9951), agreed with Martin that the two first discussed Laukus's case at or around the time of their class reunion in the summer or fall of 2006. (TR at 10044.) It was at that time that he "got Firca involved" by asking him to determine whether Laukus had a case against defendants. (TR at 10044-45.)

Dattilo did not meet plaintiff until January 5, 2007, when plaintiff, his former wife Renee, and Martin met with Dattilo, Skeriotis, and Firca at Brouse McDowell's Akron office. (TR at 10045.) While Dattilo professes that he has no independent knowledge of what happened next, he surmises from subsequent investigation into the matter that plaintiff gave a set of documents, including a copy of

the June 1, 2004 receipt, to Firca at the meeting. (TR at 10065-66.) According to Dattilo—and contrary to Martin's deposition testimony—this would have been the first time anyone from Brouse McDowell received any relevant documents in this case. (TR at 10065.)

Dattilo also, however, hedged his testimony by stating, "I mean, I might have been there when he handed it to him. I'm not going to—I'm under oath here, so I'm not going to state specifically that I didn't see him give them to him. But I'm saying I don't remember them and they were nothing—anything that meant anything to me." (TR at 10066.) Dattilo went on to explain that the only documents he was interested in were the February 28, 2005 cease and desist letter and Rio's response, and that he would not have been interested in any others in determining whether he would take the case. (TR at 10066.)

Once Brouse McDowell was retained by Laukus, Dattilo stated that Laukus, himself, gave him what Dattilo believed to be all of the relevant documents that were still under Laukus's control. (TR at 10050.) While Dattilo was aware that Martin had stated in his deposition that Martin had furnished Dattilo with a complete set of all of the documents Martin had received from plaintiff back in 2006 (which would have included the June 1, 2004 receipt), Dattilo insisted that Martin was mistaken which, as it turned out, he was not. (TR at 10046, 10080.)

Their failure to fulfill their discovery obligations was underscored when both Dattilo and Skeriotis admitted that they never asked Martin for relevant documents

or otherwise searched in any other location for responsive documents.[9] (TR at 10061, 10125.) This is remarkable, given the fact that while Dattilo and Skeriotis were principally responsible for discovery, and Dattilo personally certified plaintiff's discovery responses, it was Martin who was most familiar with the case and had been plaintiff's counsel since at least the summer or fall of 2006.[10]

Likewise, Dattilo did not ask Laukus's pre-litigation counsel, McMahon, for any documents responsive to discovery until after the sanctions motion was filed, even though the flag kit Laukus purchased from Lowe's on June 1, 2004 was in McMahon's possession. (TR at 10125, 10186.) [11]

Thus, at the sanctions hearing, Dattilo claimed that the discovery responses indicating that plaintiff first learned of the alleged infringement in 2005 were "consistent with everything we had in this case[.]" (TR at 10058.) Yet, his own testimony on this subject was hopelessly inconsistent. On the one hand, Dattilo maintained that the discovery responses and plaintiff's deposition testimony indicating that plaintiff first learned of the alleged infringement in 2005 were in line with the evidence in the case. On the other hand, Dattilo also testified that he determined at some point during the deposition that plaintiff was mistaken about the date. Dattilo explained that he realized,

---

[9] Dattilo testified, "if I had hindsight, perfect hindsight right now, I think I would have asked for those documents. But that's hindsight." (TR at 10086.)

[10] Even though the date of Martin's fee agreement with Laukus was January 5, 2007, Martin's time records reflect entries as early as July 29, 2006. (Doc. No. 326-8 at 9954.)

[11] Interestingly, until the receipt was produced at the Martin deposition, Dattilo believed that Laukus had not purchased a flag. (TR at 10207.) Of course, had Dattilo followed up with his client regarding his testimony by inquiring as to what had become of the flag Laukus purchased, he likely would have learned early on in the case that McMahon was in possession of it and, at that point, realized that that important piece of evidence had not been produced. Production of the flag kit (which was still in the box in which it was purchased) could have, in turn, perhaps led to the discovery of more information regarding the timing of the purchase.

"My God, he had to know this in at least before the fall of 2004." (TR at 10097; *see* TR at 10103-04 [While Dattilo stated that he believed that Laukus was wrong on the dates "one way or another," he suggested that it was still reasonable to believe that his client did not know about the alleged infringement until shortly before the cease and desist letter was sent.]) Notwithstanding this revelation, Dattilo did not seek to supplement previous discovery responses, or correct plaintiff's deposition testimony by way of an errata sheet. He also did not believe that his "new understanding" precluded his client from relying on the much later February 2005 date on summary judgment or in oral argument before the Sixth Circuit.

Nor did Dattilo's understanding of the facts prevent him from making other arguments on appeal. While Dattilo agreed with the panelist that his client could have relied on the longer Michigan statute of limitations, he testified at the sanctions hearing that he knew that his client was not even aware of the Michigan statutory period.[12] (TR at 10072.) Likewise, he testified that Martin was unaware of the limitation periods of Michigan and Ohio, and further indicated that plaintiff's pre-litigation attorney, McMahon, had not made an issue of the Michigan statutory period. (TR at 10073, 10075.)

When the case returned on remand, Martin withdrew as counsel of record so that he could testify on behalf of his client on the issue of laches. Dattilo testified that his immediate response to the subpoena *duces tecum* issued to Martin by defendants in conjunction with the deposition notice was not to produce any documents because

---

[12] Even after the Sixth Circuit argument, Dattilo admitted that he could not confirm that there was a legitimate basis upon which the Michigan statute of limitations could be raised. (TR at 10073 and 10099.)

20

discovery had closed.[13] (TR at 10061.) Nonetheless, he directed Martin to bring his entire file on the case with him. Dattilo met with Martin the day before the scheduled deposition and reviewed his documents. Dattilo immediately saw the receipt as it "jumped out at [him]." (TR at 10063.) He testified that the discovery of the receipt actually upset him. (TR at 10063.) Recognizing that the receipt had not been disclosed in discovery, he asked Martin about it, and Martin replied that he had previously given Dattilo *everything* he had related to the present litigation. (TR at 10063-64.) A search of the files at Brouse McDowell revealed a copy of the receipt in Firca's file, which had been labeled "AMERICAN PRIDE."[14] (TR at 10064.) When the file containing the receipt was discovered, Dattilo apologized to Martin.[15] (TR at 10064.)

Dattilo believed that he would have found the copy of the receipt eventually because he had already directed that all files be shipped to Brouse McDowell's Cleveland office for final trial preparation. (TR at 10068.) He explained, "And I would have, before the trial, looked at every single document and I would have found it. I'm sure I would have found it, and I would have turned it over at that point no

---

[13] The Court notes that this was an entirely frivolous position as plaintiff had not announced his decision to rely on his counsel as a fact witness until years after the close of discovery. Setting aside the fact that many of the documents should have been produced during the normal course of discovery, once Martin took on the role of witness, the defendants were entitled to receive the requested documents.

[14] In his affidavit, Firca averred that he placed the documents he received at the January 5, 2007 meeting in a redweld research file. When he left the firm on August 17, 2007, he left the "American Pride" file with his assistant. (Doc. No. 323-5 at 9726-7.) While plaintiff's counsel suggested that the placing of litigation documents in a research file violated Brouse McDowell firm policy, no such policy was ever produced, identified, or otherwise established.

[15] The Firca file contained and Martin referenced in his deposition other documents, including photographs of Rio's product, that were responsive to defendants' discovery requests but were not produced or otherwise identified in discovery. The Court focuses upon the receipt, the Delaney email chain and the Delaney retention letter (*see* discussion *infra*) because these documents were most relevant to the laches issue.

matter what the consequences, no matter what the effect is. I would have turned it over if I had found it." (TR at 10068.)

Following the discovery of the receipt, Dattilo instructed Skeriotis, who also attended the meeting with Martin (TR at 10118) and who was to defend Martin during his deposition, to turn over everything in Martin's file. He claims he did not mention the receipt to Skeriotis, nor did he take steps to contact opposing counsel to advise them of the discovery of the receipt.[16] He offered several reasons for these omissions. First, he indicated that he was "kind of a little bit shell-shocked" by his discovery of the receipt. (TR at 10069.) Second, he explained that he was "in a little bit of a hurry" because his brother was in town and there was to be a family golf outing the next day, and his mother was holding dinner for him that evening. (TR at 10069, 10109.) Finally, he stated that he was concerned that Martin's file might have included other documents that had not been disclosed and he did not want "accusations" from opposing counsel that he had highlighted one document at the expense of others. (TR at 10069-70.) Nonetheless, he was confident that defense counsel would see the receipt.[17]

Plaintiff also offered the testimony of Skeriotis, who testified that he was present at Martin's deposition the following day. He stated that he copied the documents, per Dattilo's instructions, and produced all but those documents he believed to be

---

[16] Given the fact that the receipt "jumped out" at Dattilo and "upset him," the Court finds it incredible that Dattilo did not discuss the receipt with Skeriotis, his law partner and co-counsel, either during the deposition preparation meeting with Martin or immediately thereafter.

[17] Of course, the duty to correct an inaccurate discovery response is not satisfied by assuming that opposing counsel will find the correction amidst other documents. *See* Fed. R. Civ. P. 26(e); *cf. Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D. 63, 77 (W.D.N.Y. 2011) (satisfying the duty to supplement or correct discovery requires the timely submission of "a supplemental response bringing [the existence of the new evidence] to the attention of the adversary party").

privileged. (TR at 10118-20.) He acknowledges that, in the process of reviewing and copying the documents, he may have disturbed the order of the documents.[18] (TR at 10120-21.)

Skeriotis also testified that he prepared the initial privilege log, which was submitted to defendants at the time plaintiff's first discovery responses were served. (TR at 10114). He explained that it was his practice to include as a descriptor of the subject the exact language of any subject line contained within the document, and nothing more (TR at 10115), and that he followed this practice in preparing the log with respect to the

---

[18] The location of the receipt in the packet of documents provided to defendants at Martin's deposition was debated by counsel at the sanctions hearing. While Skeriotis insists it was the second or third page of the production, defense counsel contend that it was located well into the stack of documents. After reviewing the transcript of Martin's deposition, the Court credits the recollection of Ronald Kopp, one of the attorneys representing defendants Wal-Mart and Sam's Club and the primary counsel involved in questioning Martin at his deposition. The receipt is found at the thirtieth page (out of eighty-one pages) of Martin's file as contained in Wal-Mart's Exhibit A from the sanctions hearing (Doc. No. 326-4 at 9878). This location appears to accurately correspond to the order of documents as Martin was being questioned about his file. (*See generally* Martin Dep. TR at 9416-32; *see also* Martin Dep. TR at 9477-9478, wherein the receipt is identified as being "about a third of the way down.")

Of course, had plaintiff's counsel Bates-stamped the documents, the positioning of the documents would have been easily determined. Also, the Court does not credit Dattilo's explanation that he did not give instructions to his staff to have the Martin file documents Bates-stamped because he did not view this production as coming from his client. (TR at 10070.) Plaintiff was the one who pursued the benefit of having his former counsel testify on his behalf at trial on the issue of laches, and plaintiff's counsel defended the Martin deposition. The production of documents associated with the Martin deposition involved documents supplied by plaintiff. If responsive to discovery requests, those documents, as appropriate, should have been produced to defendants or identified in the privilege log. Regardless of the location of the receipt in Martin's file, plaintiff and his counsel cannot explain away the fact that no one on plaintiff's litigation team flagged the receipt for defendants and their counsel.

The Court is also skeptical of the timing of the copying and production of Martin's file at his deposition. Instead of copying the file the evening before or in advance of when the deposition started, plaintiff's counsel apparently waited until the deposition started to begin the copying process. As a result, the deposition transcript reflects a number of instances when defense counsel is inquiring as to the status of production of the exhibits. (*See, e.g.*, Martin Dep. TR at 9393, 9397, 9403 and 9416.) Defense counsel should not have been required to wait until mid-way through the deposition to receive the documents. Given that Martin's file contained highly material documents that had been withheld during discovery, counsel's decision to delay production until the middle of the deposition suggests a strategy of distracting defense counsel so that they might not fully appreciate the significance of these documents.

23

June 1, 2004 email from plaintiff to Washington, DC attorney Delaney.[19] (TR at 10131.)

He was then asked several questions regarding the Delaney email. While acknowledging that the email addressed Rio's use-based application for the term "American Pride," and that the email was some evidence of plaintiff's knowledge of the existence of the application, he maintained that it was not probative of when plaintiff learned that Rio may have been using his mark. He explained that it was his opinion that Laukus did not know that he had an infringement claim until the cease and desist letter went out. (TR at 10137-38.) Relying on unidentified case authority, he insisted that until there has been time to analyze a situation, there can be no knowledge of the possibility of a claim.[20] (TR at 10138.)

Following this exchange, plaintiff, through counsel, waived the privilege attached to the Delaney email for purposes of the present motion, as well as the privilege associated with a second document, a June 11, 2004 engagement letter from Delaney to Renee Laukus. (TR at 10161-10163; Doc. No. 326-5, Rio Sanctions Hearing Exhibit A [Delaney email]; Doc. No. 326-6, Rio Hearing Exhibit B [Delaney engagement letter].) The email from Delaney also included plaintiff's email reply to Delaney. Plaintiff's reply

---

[19] The initial privilege log Skeriotis prepared illustrates the inadequacy of his "one-size fits all" policy of limiting any descriptor to the subject line of a document. Indeed, two of the documents (a February 3, 2005 letter to plaintiff from "Brian P." and a November 9, 2005 letter from Butzel Long to Kyle Laukus) did not have subject lines, and Skeriotis gave no descriptor at all, leaving the reader at a total loss as to even the general nature of the document. (*See* Doc. No. 324-1, Privilege Log.) It is extremely troubling that Skeriotis refused to acknowledge the deficiency in his policy and failed to recognize that his practice does not meet his professional obligations pursuant to Federal Rule of Civil Procedure 26(b)(5).

[20] Though aware of Skeriotis's position that, for the purposes of laches, the delay can only be measured from some future date following "a full investigation" of the potential claim, even his law partner and co-counsel did not accept this argument. When asked about this argument, Dattilo responded: "But based on my—based on the—if somebody buys that argument that Mr. Skeriotis believes, I think he could probably better testify to that than I. But it was always my belief that we would have a problem with that argument." (TR at 10090.)

was significant because it shed light on what he believed to be Rio's first date of infringement. The initial email from Delaney, sent at 6:20 PM on June 1, 2004 (three hours after plaintiff's purchase of the Rio flag from Lowe's), contained a link to a website and the following message: "As we discussed this afternoon, here is the link to the pending application by Rio Brands." (Rio Sanctions Hearing Ex. A.) Laukus's response, sent approximately 30 minutes later, provided, in relevant part:

> Looked at the link. Looks like these folks jumped the gun! Am I correct in assuming Rio Brands has been using the mark since June of 2003? Can I also assume that Rio Brands never did a trademark search?

(Sanctions Hearing Ex. A.) Confronted with the contents of the email chain, Skeriotis continued to dispute that the email demonstrated that plaintiff was aware on June 1, 2004 that Rio had been using the mark since 2003, suggesting both that plaintiff was merely posing a question, and that one does not know of such use merely because an applicant (in this case, Rio) represents in a *use-based* application that it is using the mark. (TR at 10173-74.) Perhaps more troubling, though, was Skeriotis's refusal to recognize that this document, coupled with the receipt and email (both dated June 1, 2004), demonstrated that Laukus had *actual* knowledge of the alleged infringement on June 1, 2004. (TR at 10173-74.)

Further, the engagement letter sent to Renee Laukus ten days after the exchange between plaintiff and Delaney removed any lingering doubt as to issue of knowledge. Specifically, the letter provides: "Per our recent telephone discussion, you have asked us to assist you in enforcing your company's AMERICAN PRIDE trademark against Rio Brands, which is selling flags and related products under the identical mark." (Rio Hearing Ex. B.) Also contained in Martin's file, this document, like the email and

like the receipt, was not produced in discovery. Unlike the Delaney email, however, it did not appear on the privilege log Skeriotis prepared during the course of discovery.

The engagement letter did appear on the amended privilege log, which was prepared by Dattilo, and was not supplied to defendants until September 5, 2012—six weeks after Martin's deposition and a mere two weeks before the sanctions hearing. (Doc. No. 324, Defendants' Reply at 9770.) Interestingly, the Delaney email now carried a more proper descriptor: "AMERICAN PRIDE Trademark Matter *involving Rio Brands, Inc*." (Doc. No. 324-2 at 9790, emphasis added.) Sadly, the difference between the two discriptors on the Delaney email underscores the level of deception plaintiff's counsel employed in this case. It was not until the threat of serious sanctions was looming large that counsel attempted to fulfill their obligations as counsel of record and officers of the court.

While the record shows that plaintiff and Martin were the only two individuals with admitted first-hand knowledge of the June 1, 2004 receipt, neither testified. The following colloquy occurred during the sanctions hearing:

> The Court: So, Mr. Price, do you have any further witnesses that you would like to call?
>
> Mr. Price: No, your Honor.
>
> The Court: Okay. And I understand that you do have—it's your choice not to call your client or Mr. Martin, even though they're apparently available. That's your strategic decision, not to call them?
>
> Mr. Price: Yes, your Honor.

(TR at 10212-13.) Instead, plaintiff and Martin each supplied affidavits. With respect to the June 1, 2004 receipt, plaintiff represents that: "Although I recognize my handwriting

on the Receipt, I have no independent recollection of the Receipt or the date on which I purchased the flag kit from Lowe's." (Doc. No. 323-1 at 9712.) The affidavit offered by Martin contradicts his deposition testimony by suggesting that he did not give a copy of his file to attorneys at Brouse McDowell until some point during the January 5, 2007 meeting in Akron. (Doc. No. 323-4 at 9724; Martin Dep. TR at 9391-92.)

## II. SOURCES FOR SANCTIONS

The Federal Rules of Civil Procedure set forth the discovery obligations of parties and their attorneys, and authorize federal courts to impose sanctions on those participants who fail to meet these obligations. "In selecting a sanction under Rule 37, a court may properly consider both punishment and deterrence." *Bratka v. Anheuser-Busch Co.*, 164 F.R.D. 448, 459 (S.D. Ohio 1995) (citing *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643 (1976)); *see Peltz v. Moretti*, No. 07-3338, 292 F. App'x 475, 478 (6th Cir. 2008) (internal citation and quotation omitted); *Bass v. Jostens*, *Inc.*, 71 F.3d 237, 241 (6th Cir. 1995). The burden to prove that the failure to comply with discovery obligations was the result of inability and not due to willfulness, bad faith or fault rests with the sanctioned party. *Reg'l Refuse Sys. v. Inland Seaway Marina*, 842 F.2d 150, 154 (6th Cir. 1988).

Rule 37(b)(2) provides for the imposition of sanctions for the failure to obey a court order to produce or permit discovery. The rule also recites a partial list of sanctions available to the district court that finds a discovery abuse. Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii). Included in this list is the dismissal of the action in whole or in part. *See* Fed. R. Civ. P. 37(b)(2)(A)(v). Courts have upheld the sanction of dismissal of an

action or a defense under this rule for a variety of discovery abuses tied to a failure to comply with a discovery order, including: withholding relevant documents from discovery, not planning and executing an effective search for responsive documents, and lying at a deposition. *See*, *e.g.*, *Valley Eng'rs Inc. v. Electric Eng'g Co.*, 158 F.3d 1051, 1054-56 (9th Cir. 1998) (dismissal appropriate where defendants withheld the "smoking gun" document); *Harmon v. CSX Transportation*, *Inc.*, 110 F.3d 364, 368-9 (6th Cir. 1997) (dismissal proper where party willfully failed to fully respond to discovery requests); *Freddie v. Marten Transport*, *Ltd.*, No. 10-2094, 428 F. App'x 801, 804 (10th Cir. 2011) (dismissal as sanction for willfully withholding highly relevant evidence and providing false deposition testimony); *Bratka*, 164 F.R.D. at 460 (default judgment on liability against defendant appropriate where defendant failed to make a good faith effort to provide the required discovery by neglecting to make an effective search for responsive documents).

Plaintiff argues that Rule 37(b)(2) is inapplicable because neither he nor his counsel has violated a court discovery order. Defendants point to the Court's Case Management Plan and Trial Order which, as revised, required the parties to produce all discoverable evidence by July 18, 2008, citing *United States v. Reyes*, 307 F.3d 451 (6th Cir. 2002), as support. While the court in *Reyes* noted that the government had been prejudiced by the claimant's failure to cooperate in discovery in that it was unable to complete discovery by the deadline set by the district court in its scheduling order, it imposed sanctions under Rule 37(d), which does not require the violation of a discovery

order.[21] *See id.* at 457. Further, courts have given inconsistent treatment to the "order" requirement in Rule 37(b). *Compare Dreith v. Nu Image*, *Inc*., 648 F.3d 779, 787 (9th Cir. 2011) (internal quotation and citation omitted) (noting that the "definition of 'order' in Rule 37(b) has been read broadly"); *JFB Hart Coatings*, *Inc. v. Am. Gen. LLC*, 764 F. Supp. 2d 974 (N.D. Ill. 2011) (same); *with R.W. Int'l Corp. v. Welch Foods*,[22] 937 F.2d 11, 16 (1st Cir. 1991) (finding that general scheduling orders are not sufficient to trigger the application of Rule 37(b)(2)); *In re Delta/AirTran Baggage Fee Antitrust Litigation*, 846 F. Supp. 2d 1335, 1354 (N.D. Ga. 2012) (same).

The Court need not resolve this issue because, even if Rule 37(b)(2) does not apply, the Court can rely on other sources for sanctions. For example, Rule 16(f) specifically provides for sanctions, including those authorized under Rule 37(b), against a party or his attorney for the failure "to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). The analysis under Rule 16(f) and Rule 37(b) is the same, and Rule 37(b)(2) sanctions and attorney's fees are available for Rule 16(f) violations. *See Resolution Trust Corp. v. Williams*, 165 F.R.D. 639, 642 (D. Kan. 1996) (applying Rule 16(f), instead of Rule 37(b) cited by the parties, to withholding of discoverable information in violation of scheduling order); Fed. R. Civ. P. 16(f)(1) and (2); *see also Allen v. Bayer Corp. (In re Phenylpropanolamine (PPA) Products Liab. Litig.)*, 460 F.3d

---

[21] Though the court cited authority that provided that "Rule 37(b) usually has no application if there has not been a court order," it specifically underscored the fact that "[t]he district court entered a scheduling order pursuant to Fed. R. Civ. P. 26(f), which stated in pertinent part that the deadline for completing discovery was September 15, 2000." *Id.* at 457 n.3 (quoting 8A Wright & Miller, FEDERAL PRACTICE & PROCEDURE, § 2289 (1994)).

[22] In *R.W. Int'l Corp.*, the court held that the general scheduling order did not specifically address the discovery issue at hand—compelling plaintiff to answer particular questions posed during his deposition. *Id.*

1217, 1227 (9th Cir. 1998) ("The goal [of Rule 16] is to get cases decided on the merits .

. . Subsection (f) puts teeth into these objectives by permitting the judge to make such

orders as are just for a party's failure to obey a scheduling order, including dismissal.");

*Rice v. Barnes*, 201 F.R.D. 549, 551 (M.D. Ala. 2001) (internal quotations and citations

omitted) ("Under Rule 16(f) courts have very broad discretion to use sanctions when

necessary to insure not only that lawyers and parties refrain from contumacious behavior,

already punishable under the various other rules and statutes, but that they fulfill their

high duty to ensure the expeditious and sound management of the preparation of cases for

trial.")

    Other rules are relevant to the Court's consideration of sanctions. "Federal

Rule of Civil Procedure 26(g) requires an attorney or the party personally to certify that

discovery responses and objections are supported by nonfrivolous argument and are not

aimed to harass, cause delay, or drive up litigation costs. The rule requires a court to

impose sanctions for any violation occurring without 'substantial justification.'" *Jones v.

Illinois Central R.R. Co*., 617 F.3d 843, 854 (6th Cir. 2010) (citing Fed. R. Civ. P. 26(g)).

The signature of counsel or his client certifies that to the best of the "person's knowledge,

information and belief formed after a reasonable inquiry" the discovery response is

complete, correct, and interposed for a proper purpose. *Id.* The Advisory Committee

Notes for Rule 26 explain:

> Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a
> responsible manner that is consistent with the spirit and purposes of Rules
> 26 through 37. In addition, Rule 26(g) is designed to curb discovery abuse
> by explicitly encouraging the imposition of sanctions. The subdivision
> provides a deterrent to both excessive discovery and evasion by imposing
> a certification requirement that obliges each attorney to stop and think
> about the legitimacy of a discovery request, a response thereto, or an

> objection. The term "response" includes answers to interrogatories and to
> requests to admit as well as responses to production requests.

Fed. R. Civ. P. 26 Advisory Committee Notes (1983 Amendment). The attorney's

signature "certifies that the lawyer has made a reasonable effort to assure that the client

has provided all the information and documents available to him that are responsive to

the discovery demand." *Id.*

"If a certification violates [Rule 26] without substantial justification, the

court, on motion or on its own, must impose an appropriate sanction on the signer, the

party on which behalf the signer was acting, or both. The sanction may include an order

to pay the reasonable expenses, including attorney's fees, caused by the violation." Fed.

R. Civ. P. 26(g)(3). In addition, if a party, without substantial justification, fails "to

amend a prior response to discovery as required by Rule 26(e)(2)," the court may prevent

that party from using that evidence at trial or at a hearing and impose other appropriate

sanctions, including the payment of attorney's fees.[23] Fed. R. Civ. P. 37(c)(1).

Federal Rule of Civil Procedure 37(d) represents yet another avenue for

sanctions. Rule 37(d) provides that the Court may, upon motion, impose sanctions if a

party fails to respond after being properly served with interrogatories. Such sanctions

may include any of those listed in Rule 37(b)(2)(A)(i)-(vi), including dismissal. *See*

*Reyes*, 307 F.3d at 457-58. While plaintiff argues that Rule 37(d) is reserved for a total

---

[23] Defendants also cite Rule 11 of the Federal Rules of Civil Procedure. "By its own terms, Rule 11 'does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37.'" *Jones*, 617 F.3d at 856 (quoting Fed. R. Civ. P. 11). While Rule 11 may apply to the arguments and legal contentions advanced by plaintiff's counsel before this Court on summary judgment and in motions *in limine*, defendants have not complied (and, given the posture of the case, cannot comply) with the 21-day safe harbor requirement. *See* Fed. R. Civ. P. 11(c)(2). The Court could order counsel to show cause why their conduct did not violate Rule 11, but will not do so inasmuch as the litigation misconduct at issue can be addressed through other rules and the Court's inherent powers. *See* Fed. R. Civ. P. 11(c)(3).

failure to respond to properly propounded discovery requests, the "majority view authorizes Rule 37(d) sanctions when a party's 'evasive or incomplete answers to proper interrogatories impede discovery.'" *Jackson v. Nissan Motor Corp.*, No. 88-6132, 1989 U.S. App. LEXIS 16348, at *14 (6th Cir. 1989) (quoting *Badalamenti v. Dunham's Inc.*, 118 F.R.D. 437, 439 (E.D. Mich. 1987)); *Airtex Corp. v. Shelley Radiant Ceiling Co.*, 536 F.2d 145, 155 (7th Cir. 1976) ("when, as here, the fact that answers to interrogatories are evasive or incomplete answers are tantamount to no answer at all . . . Rule 37(d) is applicable"); *Bell v. Automotive Club of Michigan*, 80 F.R.D. 228, 232 (E.D. Mich. 1978).

In addition to this rule-based authority, federal courts have the inherent power to impose sanctions to prevent the abuse of the judicial process. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991); *Link v. Wabash R.R.*, 370 U.S. 626, 629-30 (1966) (federal trial courts have the inherent power to manage their own dockets). A court may exercise its inherent power to sanction when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," or when the conduct was "tantamount to bad faith." *Metz v. Unizan Bank*, 655 F.3d 485, 589 (6th Cir. 2011) (citing *Chambers*, 501 U.S. at 45-46; *Roadway Express, Inc v. Piper*, 447 U.S. 752, 767 (1980); *see, e.g., United States v. Moss-American, Inc.*, 78 F.R.D. 214, 216 (E.D. Wis. 1978) ("it is within the inherent equitable powers of this court to dismiss an action when a just determination of the action has been seriously thwarted by a plaintiff's willful misconduct").

### III. SANCTIONABLE CONDUCT

#### A. *Plaintiff's Misconduct*

Counsel for plaintiff have taken full responsibility for any discovery misconduct, and suggest that plaintiff—"who did nothing wrong"—should not be sanctioned. (Doc. No. 323 at 9710.) The Supreme Court has noted that: "[t]here is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Link*, 370 U.S. at 633-34; *see Wade v. Soo Line R.R. Corp*., 500 F.3d 559, 564 (7th Cir. 2007) ("Attorneys' actions are imputed to their clients, even when those actions cause substantial harm."); *Tech. Recycling Corp. v. City of Taylor*, Nos. 04-1798/04-2205, 186 F. App'x 624, 632 (6th Cir. 2006) (internal quotation omitted) ("[A] client, having chosen a particular attorney to represent him in a proceeding, cannot avoid the consequences of the acts or omissions of this freely selected agent . . . .") (quoting *McCurry v. Adventist Health Sys./Sunbelt*, *Inc.*, 298 F.3d 586, 595 (6th Cir. 2002)).

Nonetheless, the Sixth Circuit has been "extremely reluctant to uphold the dismissal of a case . . . merely to discipline an errant attorney because such a sanction deprives the client of his day in court," and has stated that "dismissal is *usually* inappropriate where the neglect is solely the fault of the attorney." *Harmon*, 110 F.3d at 367 (internal citations and quotations omitted, emphasis in original); *see Coleman v. American Red Cross*, 23 F.3d 1091, 1094-95 (6th Cir. 1994) (internal citation and quotation omitted) (same). Further, the Sixth Circuit has noted that it applies the factors

33

to be considered in reviewing dismissals as sanctions "more stringently in cases where the plaintiff's attorney's conduct is responsible for the dismissal." *Harmon*, 110 F.3d at 367.

The concern that a blameless litigant may be asked to pay for the discovery sins of his counsel is not before this Court. Instead, the Court properly announces its findings against plaintiff first because, far from blameless, he is primarily responsible for the discovery misconduct. *See Grange Mut. Cas. Co. v. Mack*, Nos. 07-5907/07-5387, 270 F. App'x 372, 376 (6th Cir. 2008) (default judgment against defendant appropriate where defendant "perpetrated the discovery abuse himself").

Plaintiff personally purchased the flag kit from Lowe's on June 1, 2004, had the foresight to keep the receipt, and even took the time to make a notation on it. This purchase was significant to plaintiff as it demonstrated to him that Rio was allegedly infringing upon his service mark, and it apparently was the only flag kit *he* purchased for that purpose.[24] The record now shows that the purchase was so significant to plaintiff that, *within hours of the sale*, he contacted Delaney, a Washington, DC trademark lawyer. Combined, the email chain with Delaney, and the engagement letter sent 10 days later, demonstrate that plaintiff and Delaney discussed a potential lawsuit against Rio. The receipt was also one of only a few documents that plaintiff gave Martin to convince Martin to represent him in this matter.

---

[24] The actual flag kit purchased by plaintiff found its way to the office of plaintiff's pre-litigation counsel, McMahon. This important piece of evidence was not timely disclosed to defense counsel, and it was not until the sanctions hearing that defendants' counsel saw it for the first time.

Given the significance of the receipt and the timing of the emails with Delaney, the Court finds plaintiff's deposition testimony that he merely contacted Delaney to generally discuss the benefits of having access to trademark counsel to be false and intentionally manufactured for the purpose of frustrating defendants' discovery efforts. In reaching this conclusion, the Court draws a negative inference from the fact that plaintiff and his counsel made a strategic decision not to offer plaintiff's testimony at the sanctions hearing. "When it would be natural under the circumstances for a party . . . to take the stand himself as a witness in a civil case, . . . and he fails to do so, tradition has allowed his adversary to use this failure as the basis for invoking an adverse inference." *Yuk Shau Mui v. Wing*, No. 86-3673, 1987 U.S. App. LEXIS 9101, at *6 (6th Cir. July 10, 1987) (quoting E. Cleary, MCCORMICK ON EVIDENCE § 272 at 804-05 (3d ed. 1984)). "In order to invoke the inference, it must be determined (1) that the uncalled witness is peculiarly within the control of one party; and (2) that the anticipated testimony will 'elucidate the transaction.'" *Id*. at *6-*7 (quoting *United States v. Blakemore*, 489 F.2d 193, 195-96 (6th Cir. 1973)).

Plaintiff, who was present at the sanctions hearing, was obviously available to testify, and the fact that the withheld document originated with him made him uniquely qualified to provide insight into the present discovery dispute. *See id.* The Court may, therefore, infer that, confronted with the existence of the previously undisclosed documents, plaintiff would have given testimony unfavorable to his position.

Nor is the Court persuaded by plaintiff's suggestion that he possesses "no independent recollection of the [r]eceipt or the date on which [he] purchased the flag kit from Lowe's." (Doc. No. 323-1 at 9712.) *See Bryant v. U.S. Postal Office*, No. 05-5122,

35

166 F. App'x 207, 211 (6th Cir. 2006) (upholding trial court's finding incredible plaintiff's memory loss as to her medical history, which was not fully disclosed during discovery). "The claim, 'I don't remember' can be a lie if the speaker does remember, and even though no one can see another's memory, the falsity is subject to proof by circumstantial evidence, admissions, and other evidence." *Valley Eng.*, 158 F.3d at 1055 (rejecting a party's memory loss as to a discovery dispute). In affirming a dismissal for a willful failure to produce discoverable evidence, a panel of the Sixth Circuit observed:

> While it is true that one is not obligated to provide perfect responses to discovery requests, and that district courts must make room for some lapses in memory, plaintiffs must do as much as they can, and certainly more than they did here, to provide defendants with all relevant discoverable information.

*Bryant*, 166 F. App'x at 211. Here, plaintiff was able to provide substantial details relating to his discussion with the postmaster that led to the immediate purchase of the flag kit from Lowe's. The Court, therefore, finds it incredible that plaintiff did not remember that his purchase of the flag kit took place in the summer of 2004, rather than in the winter months of February or March of 2005 in Michigan. Moreover, it simply defies all logic that plaintiff did not remember that the conversation with a Washington, DC trademark lawyer was precipitated by the purchase of an allegedly offending product mere hours before. The fact that he offered a detailed (and entirely different) account of this conversation at his deposition makes it even less likely that his memory loss is

genuine.[25]

Indeed, plaintiff has been playing a calculated game of "hide the ball" since the beginning of this litigation, and has been using a variety of ploys, including misdirection and temporary amnesia, to cover his tracks. Plaintiff's deposition, for example, is littered with examples where he either could not remember significant details, or did not know the whereabouts of highly relevant documents. (*See* Doc. No. 280, Plaintiff Dep. TR at 6016 [time frames "fuzzy"], 6050-51 [cannot give exact time frame used business sign in front yard], 6056-58 [some records are gone], 6091 [cannot find records, former wife had them], 6094 ["Dates are my worst memory subject"], 6122 [sales figures are missing], 6145 [tax returns not available], 6169-70 [records not produced are either missing or were seized by the government], 6198 [does not remember details of customers who expressed product confusion], 6220 [does not remember subject matter of letter from plaintiff to Attorney McMahon], 6249 ["foggy" with dates as to when contacted Attorney Martin]; Doc. No. 281 at 6658 [does not know American Pride sales for 2005-2007, wife handled this], 6659 [unaware of company's sales from 2001 to 2007], 6659 [American Pride sales records not available to him], 6681 [cannot quantify the number of flag pole installations his company does per year], 6732 [does not know how many customers his company has], 6754 ["Like I said, earlier on, the dates are foggy to me. To try to put everything in date chronological order is not something that I enjoy

---

[25]  That Laukus and Delaney discussed a potential lawsuit against Rio during their June 2004 exchanges was also referenced by Martin during his deposition. Martin testified that when he was discussing the cost of potential litigation with Laukus in 2006 and 2007, he made specific reference to a cost estimate contained in the June 11, 2004 engagement letter that Delaney sent to Laukus, which, in turn, Laukus forwarded to Martin. (Martin Dep. TR at 9444.) This information serves to reinforce the Court's finding that Laukus, fully aware that his discussion with Delaney involved pursuing an infringement action against Rio, intentionally withheld this information at his deposition.

or specialize in."]) Given that plaintiff has attempted to thwart any effort by defendants to discover material evidence, his actions are tantamount to a total and complete failure to prosecute this case in good faith. While the Court does not assess sanctions under Rule 41(b), this rule would provide yet another source for such an award.[26] *See Sexton v. Uniroyal Chem. Co*., No. 01-5772, 62 F. App'x 615 (6th Cir. 2003) (affirming dismissal of action under Rule 41(b) for failure to prosecute and for failure to comply with discovery orders); *see also Link*, 370 U.S. at 629 (citing Fed. R. Civ. P. 41(b) ("The authority of a federal trial court to dismiss a plaintiff's action with prejudice because of his failure to prosecute cannot seriously be doubted."))

The Court is left with the unavoidable conclusion that plaintiff intentionally and willfully withheld documents in an effort to thwart defendants' ability to discover material evidence bearing on plaintiff's claims. Toward that end, the Court finds that plaintiff has also willfully provided false deposition testimony, verified misleading and evasive discovery responses, neglected to correct inaccurate discovery responses, and failed to correct improper arguments made on his behalf by his counsel. Moreover, he has failed to demonstrate "substantial justification" for his discovery misconduct. His actions violated several federal civil rules, including Rule 16(f), Rule 26(e) and (g), and Rule 37(c)-(d), and are deserving of sanctions under these rules, as well as the Court's inherent powers.

---

[26] Application of Rule 41(b) follows the same four-factor analysis employed for Rule 37 sanctions. *See Sexton*, 62 F. App'x at 617-19 (citing *Regional Refuse Sys.*, 842 F.2d at 153-55) (affirming dismissal of action with prejudice for failure to prosecute and failure to comply with the court's scheduling order).

B.  *Misconduct of Counsel*

Plaintiff did not, however, act alone, and his subterfuge would not have been successful without the assistance of his retained attorneys. Beginning with Dattilo, the Court finds his testimony not only disappointing, but highly suspect. As set forth above, Dattilo offered testimony that was both internally inconsistent and contrary to that of Martin, his co-counsel. In particular, the Court does not credit Dattilo's representation that Martin is mistaken that he gave Dattilo a copy of his file in 2006. It is uncontroverted that Martin was shopping various intellectual property law firms in 2006, and that he provided copies of his files, including the June 1, 2004 receipt, to at least one other Ohio-based firm. (Martin Dep. TR at 9390-91.) It is, therefore, unlikely that he would not have provided this same documentation to Dattilo. Further, because plaintiff and his counsel chose not to permit Martin to testify at the hearing, though he had personal knowledge and was available, the Court is free to draw the inference that his testimony on this subject would have been adverse to plaintiff and his counsel. Regardless, even if Martin did not give the documents to Dattilo and the Browse McDowell law firm until the January 5, 2007 meeting, Dattilo was in possession of the documents prior to when the lawsuit was filed and prior to when he participated in discovery and court proceedings.

The only consistency in Dattilo's testimony comes in the lack of care he gave to his discovery obligations. Though he certified the discovery responses, there is no evidence that Dattilo made a reasonable effort to determine that he had identified and searched all discoverable information and documents. He never asked Martin, one of his co-counsel in the case, and the attorney who sought out Dattilo and his firm to serve as co-counsel, for documentation. Likewise, he never conducted an effective search of his

firm's records, apparently reserving this basic function for his trial preparation only. Even after Dattilo had reason to believe that his client was mistaken on certain highly relevant dates, he did not inquire further of his client or search possible sources (even those within his own firm) or otherwise investigate to ensure that the discovery responses were correct. Because he did not exercise a reasonable search, his efforts fall short of complying with the mandates of the civil rules.

Indeed, it is clear from the record that much more care was given to ensuring that the case would be profitable than to ensuring that counsel met their obligations as officers of the court. Even after Dattilo discovered that a critical document had not been disclosed in discovery, and that defendants had relied on plaintiff's misrepresentations as to the date plaintiff first learned of Rio's alleged infringement, Dattilo did not bring this error of omission to the attention of opposing counsel. The Court finds incredible counsel's suggestion that he did not flag the previously unproduced receipt because he did not want to draw attention to this particular omission, at the risk of possible others. Given the fact that Martin's entire file contained only 81 pages of documents, even a detailed review would have taken a short amount of time. It is much more likely that Dattilo either hoped that the document would go unnoticed by opposing counsel, or that his family plans simply took precedence over his professional responsibilities. (TR at 10109.) Like his client, Dattilo has failed to offer substantial justification for his misconduct.

In fact, counsel's own testimony demonstrates that he had two standards for the treatment of relevant information in this case: one for identifying information and documents responsive to opposing parties' discovery requests, and another for preparing

40

his own client's case for trial. His testimony demonstrated that he did very little to ensure that he was in possession of all relevant documents and other evidence before responding to discovery. In contrast, when it came to trial preparation, he testified that "because we were getting ready to get ready for trial which was supposed to be in about a month . . . we worked to make sure we had everything. I wanted the universe of documents in front of me." (TR at 10089.) As he explained earlier in his testimony, he was planning to reserve a more thorough review of "every single document" for trial preparation, which would have revealed the June 1, 2004 receipt, and claims that he would have turned over the document "at that point no matter what the consequences . . . ." (TR at 10068.) Because of his woefully inadequate attention to discovery, the consequence he now faces is that his conduct is subject to sanctions under Rule 16(f), Rule 26(g), Rule 37(b) and (d), and the Court's inherent powers.

The Court finds that co-counsel Skeriotis also bears responsibility for the discovery failure. Skeriotis was an integral part of the trial team, he was the signatory of the complaint, and he was primarily responsible for reviewing privileged documents and preparing the initial privilege log. At the hearing, defendants suggested that Skeriotis's decision to only include the information in the subject line of the Delaney email in the privilege log violated Rule 26(b)(5), which requires privilege logs to contain information sufficient to "enable other parties to assess the claim." In *Cooey v. Strickland*, 269 F.R.D. 643, 649 (S.D. Ohio 2010) (internal citations and quotations omitted), a court in the Southern District of Ohio explained:

> The privilege log must be detailed enough to prove that the communications in question were in fact confidential communications relating to legal advice. The party asserting the privilege must make at

least a minimal showing that the communication contained legal matters, but that showing need not be onerous and may be satisfied by as little as a statement in the privilege log explaining the nature of the legal issue for which advice was sought. However, merely conclusory statements may not be enough to satisfy this minimal standard. A "cryptic privilege log" does not satisfy this standard if review of the documents themselves fails to reveal whether they were produced or transmitted in the course of legal representation.

At first blush, Skeriotis's description of the subject of the email as "AMERICAN PRIDE Trademark Matter" would seem to satisfy the letter of the rule as there is enough information for a court to determine that the conversation involved legal advice. Even without the word "Rio," the description reveals that it was "transmitted in the course of legal representation," which, of course, it was. But this does not end the matter, particularly given the issue of laches in this case, and especially given that plaintiff repeatedly feigned an "unclear" or "foggy" memory relative to the significant events that occurred on the date of the email. Rather, to satisfy the "minimal standard" of Rule 26(b)(5), given the facts of this case, an accurate description of the subject matter would have required a notation that the topic of the email was Rio's use trademark application. This is particularly true given that four entries between 2005 and 2007, including a March 22, 2005 letter to Kyle and Renee Laukus from pre-litigation counsel, McMahon, with the descriptor "Use of 'American Pride' by Rio Brands," mention Rio specifically in the privilege log. Likewise, another entry, dated October 18, 1991, identifies "Service Mark infringement by Innovative Touch" as the subject of the privileged communication. (Doc. No. 326-2.)

Additionally, given that the email was sent on the same day as the June 1, 2004 purchase by Laukus, a failure to include any reference to Rio in the subject line

suggests that the omission was a deliberate attempt to conceal discovery or otherwise prevent defendants from learning the truth of when Laukus first knew of Rio's alleged infringement. At the hearing, Skeriotis suggested defendants could have determined the true nature of the topic of the communication by asking plaintiff. (TR at 10130.) Defendants did ask, but the Court has determined that plaintiff's untruthful answer served as an effective ruse. The question then becomes whether Skeriotis was knowingly complicit in this fraud.

The argument that Skeriotis's entry in the privilege log was innocent is negated by the highly relevant nature of the evidence that plaintiff and his counsel are alleged to have concealed. *See Wade*, 500 F.3d at 561-62 (withholding of highly relevant "smoking gun" documents justified dismissal with prejudice and the assessment of fees and costs). At the hearing, Skeriotis claimed that he was unaware that laches was an issue in the case until the summary judgment stage, and indicated that he did not recall whether he participated in preparing the motion for a temporary restraining order. (TR at 10132.) The record shows, however, that he signed both the motion for a temporary restraining order and the reply, and the reply specifically addressed defendants' laches argument. (*See* Doc. Nos. 2, 9.)

Moreover, Skeriotis's testimony at the hearing was combative and evasive, and his testimony on the subject of laches was so preposterous that it stretched

the limits of credulity.[27] When asked if the email established that Laukus had notice of Rio's alleged infringement by at least June 1, 2004, Skeriotis insisted that it did not. (TR at 10149-50.) Even after plaintiff waived the privilege with respect to the email, and Laukus's comment "Looks like these folks jumped the gun! Am I correct in assuming Rio Brands has been using the mark since June of 2003?" was revealed, Skeriotis still insisted that the email was not evidence of Laukus's knowledge, offering the ridiculous argument that a person really does not have any knowledge of possible infringement until

---

[27] The Court notes that Skeriotis was also combative with opposing counsel during Martin's deposition. After Skeriotis admitted that he "mixed up the documents" in Martin's file, he refused to answer any questions relating to the original order of the documents and whether he removed any documents from the file during his review. (Doc. No. 315-1, Martin Dep. TR at 9398-40.) Skeriotis's position that he did not have to answer defense counsel's reasonable inquiries because he was "not the witness" is especially troubling, given the fact that the amended privilege log, which would have shown what documents were removed from the Martin file as privileged, was not produced to defendants until more than one month *after* Martin's deposition. Plus, when defense counsel initially asked Martin at his deposition if either he or counsel removed any documents from Martin's file prior to it being delivered to defense counsel, Martin responded by saying "no." And instead of correcting the record and disclosing that he had removed documents, Skeriotis's only response was to lodge an objection to the question. (Martin Dep. TR at 9396.) Later, toward the end of the deposition, after being asked a second time, Martin did reveal that his fee contract with Laukus was not produced. (Martin Dep. TR at 9480.) Otherwise, no other information regarding what may have been removed from the file was disclosed at that point in time.

44

he has conducted a full investigation.[28]

Nor is the Court swayed by Skeriotis's representation in his affidavit that "[a]lthough I must have read [the] June 1, 2004 [email] in connection with my privilege review, I do not now have, nor did I have during the subsequent litigation of this case, any recollection of it." (Doc. No. 323-2 at 9716.) Like his client, counsel's temporary bout with selective amnesia rings hollow—especially in light of the fact that out of the relatively small number of documents he was required to review (many of which were invoices) only a mere eight documents qualified as privileged. Aware, as he should have been, that the Delaney email demonstrated plaintiff's knowledge in June 2004 of possible infringing conduct, and having been intimately involved in this litigation throughout, Skeriotis had a duty to correct any discovery responses or legal arguments he knew to be misleading.

---

[28] With respect to laches, "[t]he period of delay begins to run when plaintiff had 'actual or constructive knowledge of the alleged infringing activity.'" *Nartron Corp. v. STMicroelectronics*, 305 F.3d 397, 408 (6th Cir. 2002) (quoting *Dana Corp. v. IPC Ltd. Partnership*, 674 F. Supp. 581, 583 (E.D. Mich. 1987)). A countermeasure to the affirmative defense of laches is progressive encroachment, which "allows the plaintiff to demonstrate that although it might have been justified in bringing suit earlier but did not, certain factors now exist that have prompted it to do so." *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 571 (6th Cir. 2000), *overruled in part on other grounds*, *Moseley v. V Secret Catalogue*, 537 U.S. 418 (2003). "Progressive encroachment requires something about the defendant's use of the mark to have changed significantly." *Nartron Corp.*, 305 F.3d at 410 (citing *Kellogg Co.*, 209 F.3d at 573) (analyzing cases in which defendants made changes to certain appearances in the mark, or expanded the use of the mark into new areas that directly competed with the trademark owner); *see also Johnny's Fine Foods, Inc. v. Johnny's Inc.*, 286 F. Supp. 2d 876, 884 (M.D. Tenn. 2003) (internal citation and quotation omitted) ("The progressive encroachment theory exists in order to prevent would-be plaintiffs from being forced to sue at the first sight of infringement, before the potential for actual confusion in the marketplace has become apparent or been realized. In other words, a plaintiff may rely on progressive encroachment in cases where an earlier suit might have been premature: it applies in cases where the defendant has engaged in some infringing use of the its trademark . . . but the plaintiff does not bring suit right away because the nature of defendant's infringement is such that the plaintiff's claim has yet to ripen into one sufficiently colorable to justify litigation.") Plaintiff has never alleged that Rio's use of the mark "American Pride" changed over time, or that it progressively encroached upon the market in which plaintiff used his mark. Of course, even if the argument of progressive encroachment had been available to plaintiff to counter defendants' laches argument, it would not have altered the factual inquiry of when Plaintiff had actual or constructive knowledge of Rio's use of the mark, nor would it have excused plaintiff's duty to timely respond to discovery requests seeking such information.

Ultimately, the Court finds it highly unlikely that Skeriotis was an unknowing accomplice in plaintiff's fraud, and concludes that the privilege log was willfully prepared in such a way as to conceal the truth about Laukus's knowledge (as early as June 1, 2004) about possible infringement by Rio. It is also clear that Skeriotis relied on unfounded legal arguments to deny defendants meaningful access to relevant discovery. His unwillingness at the sanctions hearing to accept even some responsibility for his own obvious misconduct is inexcusable, and he has not offered substantial justification for this or for the underlying misconduct. Therefore, his conduct is sanctionable under Rule 16(f), Rule 37(b) and (d), and the Court's inherent powers.

Finally, Martin is responsible for the discovery violations because he has served as Laukus's counsel since before the inception of the lawsuit,[29] until most recently when his client decided to call him as a witness (ironically enough to bolster his client's position on the subject of laches).[30] While he testified in his deposition that he was aware of the receipt—one of only 81 pages in his file—and at all times had a copy of this document along with the email and engagement letter in his file, he made no effort to ensure that his client's discovery responses were correct. He also sat through both of plaintiff's depositions and, notwithstanding his suggestion that he was only listening for

---

[29] Laukus's first contingent fee agreement with Martin was executed on January 5, 2007. (Doc. No. 326-8 at 9961-62.) A second agreement was entered into on June 14, 2007, after Brouse McDowell was retained. That second engagement letter, authored by Dattilo, provides, in part:

> John Skeriotis and I from Brouse McDowell, and Richard Martin of Richard P. Martin Co., LPA, will be the attorneys primarily responsible for the legal work, although other professionals and staff from either firm may be utilized as we deem appropriate. . . .

(Doc. No. 326-8 at 9951.) Additionally, Martin's name appears on the pleadings and other case filings, as well as discovery responses.
[30] In his deposition, Martin testified that he has a contingency fee agreement with both plaintiff and Brouse McDowell. (Martin Dep. Tr. at 9372, 9474; *see also* Doc. No. 326-8 at 9951.)

"flow" (Martin Dep. TR at 9408), did not attempt to correct what he should have known to be false and misleading testimony regarding the purchase of the Lowe's flag and the June 1, 2004 conversation with DC counsel. As set forth previously, in his pre-suit investigation and discussions with Laukus, he demonstrated actual knowledge of the information contained on the receipt and the true nature of Laukus's contact with Delaney in June 2004. He had an affirmative duty to correct the record, but failed to do so. His apparent decision to abdicate all responsibility for discovery to counsel from Brouse McDowell does not relieve him of his duties as counsel of record and an officer of the court. *See Qualcomm Inc. v. Broadcom Corp.*, Case No. 05cv1958-B (BLM), 2008 U.S. Dist. LEXIS 911, at *46 n.9 (S.D. Cal. Jan. 7, 2008) ("the Court believes the federal rules impose a duty of good faith and reasonable inquiry on all attorneys involved in litigation who rely on discovery responses executed by another attorney"), *vacated in part on other grounds*, 2008 U.S. Dist. LEXIS 16897 (S.D. Cal. Mar. 5, 2008). Like his co-counsel, he has offered no substantial justification for his misconduct, and he is also subject to sanctions under Rule 16(f), Rule 37(b) and (d), and the Court's inherent powers.

## IV. ACTUAL SANCTIONS

Having concluded that the conduct of plaintiff and his counsel is sanctionable, the Court must determine the appropriate penalty—one that will adequately compensate defendants, and deter future litigants and counsel from engaging in similar discovery misconduct. Defendants' motion seeks dismissal of the present action with prejudice, as well as attorney's fees and costs.

"Dismissal is the sanction of last resort. It should be imposed only if the court concludes that the party's failure to cooperate in discovery was willful, in bad faith, or due to its own fault." *Beil v. Lakewood Eng'g and Mfg. Co.*, 15 F.3d 546, 552 (6th Cir. 1994). The selection of a particular sanction is reviewed for an abuse of discretion. *National Hockey League*, 427 U.S. at 642. The Sixth Circuit has identified four non-dispositive factors for determining whether a district court's sanction of dismissal represents an abuse of discretion:

> (1) whether the party's failure is due to willfulness, bad faith or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered.

307 F.3d at 458 (internal quotation and citation omitted); *see Regional Refuse Sys*, 842 F.2d at 155; *Fharmacy Records v. Nassar*, Case Nos. 08-1607 & 08-2201, 379 F. App'x 522, 524 (6th Cir. 2010); *Reyes*, 307 F.3d at 458. Although "none of the factors is outcome dispositive, . . . a case is properly dismissed by the district court where there is a clear record of delay or contumacious conduct." *Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 737 (6th Cir. 2008) (internal quotation and citation omitted).

### A.  Willfulness, Bad Faith and Fault

With respect to the first factor, the burden of showing that a failure to comply with court orders and discovery requests was due to inability, not willfulness or bad faith, rests with the individual against whom sanctions are sought. *Reyes*, 307 F.3d at 458. "Thus, it is presumed that dismissal is not an abuse of discretion if the party has the ability to comply with a discovery order but does not." *Id.*; *see*, *e.g.*, *United Steelworkers*

48

*v. Forestply Indus., Inc.*, Case No. 2:08-cv-281, 2011 U.S. Dist. LEXIS 37766, at *17 (W.D. Mich. Apr. 1, 2011) (defendants "had the ability to comply with the plaintiff's requests for discovery but they chose not to do so without good reason and without justification"), *aff'd*, 2012 U.S. App. LEXIS 8636 (6th Cir. Apr. 6, 2012); *Shapiro v. Plante & Moran*, LLP (*In re Connolly North Am. LLC*), 376 B.R. 161, 184 (E.D. Mich. 2007) (fault properly assessed against party who had the ability to disclose the undisclosed document and, instead, gave incorrect and misleading discovery responses).

The receipt was originally procured by plaintiff, and a copy was in the files of Martin and Brouse McDowell throughout this litigation. Thus, plaintiff and his counsel had the ability to comply with discovery, but did not and, instead, concealed that material document, as well as others, and provided evasive and misleading discovery responses. This evidence supports a clear finding of fault. *See JFB Hart Coating*, 764 F. Supp. 2d at 982 (citations omitted). Moreover, plaintiff obviously had the ability to disclose that a copy of the receipt existed, as well as the existence and location of the flag connected to the receipt, and also to provide truthful testimony at his deposition, as set forth above. Substantial evidence supports a finding that the conduct of both plaintiff *and* his counsel amounted to willfulness and bad faith. Indeed, the Court finds that plaintiff and his counsel "have conducted a campaign of fraud." *See Fharmacy Records*, 379 F. App'x at 527 (affirming dismissal of action where plaintiff and his counsel destroyed and misrepresented evidence, and made late disclosures of responsive documents).

In considering this first factor, it is important to underscore the fact that this is not a document intensive case where one document was mistakenly omitted from the production of countless bankers' boxes full of documents. *Cf. JFB Hart Coating*, 764

49

F. Supp. 2d at 982 (distinguishing cases where discovery misconduct involved a "minor blunder" or a "mere mistake or slight error in judgment"). The totality of the documents plaintiff produced in this case numbed less than 1000, and the parties agree that the vast majority of these documents were copies of invoices.[31] Further, the number of documents identified as privileged in the initial log was a scant eight documents. Even when all the other documents in counsel's possession were finally identified, the total number of entries was less than twenty-five. The importance of the receipt, email and engagement letter; the motive of plaintiff and his counsel to preserve plaintiff's right to past damages; the ease in which these documents were finally located; the *admitted* knowledge that at least one of plaintiff's attorneys (Martin) had regarding material undisclosed documents and information; and the fact that these few highly relevant and potentially damaging documents were not disclosed support a finding of willfulness and bad faith. The first factor, therefore, weighs heavily in favor of dismissal.

### B.  Prejudice to Defendants

Plaintiff argues that defendants have not been prejudiced because discovery of the receipt "changes nothing other than to add another issue for the fact finder to consider." (Doc. No. 323, Plaintiff's Opposition Brief at 9702.) He claims that the receipt is not a "game changer" in that earlier discovery of this document would not have altered the outcome on appeal. (Opposition Brief at 9701.)

---

[31] The parties agree that, excluding invoices, the number of pages of documents produced is approximately 181. (TR at 10005.)

The Court is not convinced. In reversing this Court's grant of summary judgment on the issue of laches, the Sixth Circuit, with unfounded encouragement from plaintiff's counsel, found that plaintiff could have reasonably relied on the three-year statute of limitations in waiting to bring his case. In doing so, the court supplied plaintiff, and his willing counsel, with a strategy to create genuine issues of material fact. This Court, which did not rely on the longer Michigan statute, found that plaintiff's other offerings fell far short. The Sixth Circuit also found that this Court erred by relying on the fact that plaintiff let several "flag selling seasons" expire before taking any effort to police his mark, emphasizing that "Laukus first discovered the infringing products during a period that fell within what the Court deemed the off-season." (Doc. No. 181, Sixth Circuit Opinion at 13173.) Had plaintiff produced the receipt, neither argument would have been available to his counsel.

Even if the outcome on appeal would have been the same, it cannot be denied that defendants have been severely prejudiced. As a result of the discovery misconduct, defendants have been deprived for five years of their right to discoverable evidence which they could have used on summary judgment, on appeal, in mediation, and in pre-trial motions before this Court. In addition, the inability to discover highly relevant information and documents has impaired their ability to prepare the case with respect to the issue of laches. Courts have found prejudice where concealment of relevant documents has impeded a party's ability to fully discover an issue. *See*, *e.g.*, *Valley Eng'rs*, 158 F.3d at 1058 (dismissal of appellant's claims was proper where appellant concealed "smoking gun" document, noting that "a party's discovery violations [may] make it impossible for a court to be confident that the parties will have access to the true

51

facts"); *Tech. Recycling*, 186 F. App'x at 636 (citing *Wittman v. Wilson*, 95 F. App'x 752, 754 (6th Cir. 2004) ("In addition to the costs imposed on defendants, plaintiffs also prejudged defendants by impairing their ability to prepare a defense.")); *see also Freddie v. Marten Transport*, 428 F. App'x 801, 804 (10th Cir. 2011) (internal citation and quotation omitted) ("The withholding of evidence substantially prejudices an opposing party by casting doubt on the veracity of all of the culpable party's submissions throughout litigation."); *Bratka*, 164 F.R.D. at 460 (concealment of relevant documents "threatened the reliability of the fact-finding process"). Moreover, defendants have identified several depositions, including plaintiff's, which would have to be reopened so that these individuals may be deposed regarding the withheld evidence. *See Design Strategy*, *Inc v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006) (finding prejudice to defendants where discovery would have to be reopened). For all intents and purposes, in light of the newly-revealed evidence, the case would need to start from the beginning to afford defendants further opportunity to conduct discovery and, if appropriate, file dispositive motions. Even if the Court were to permit this, given the duplicitous conduct exhibited by Laukus to date, the Court is not confident that Laukus will fully comply with his

discovery obligations. This factor also weighs heavily in favor of dismissal.[32]

### C.  Prior Warnings

Defendants suggest that plaintiff and his counsel were on notice because "[f]iling a motion for sanctions seeking dismissal puts a party on notice that the court is contemplating dismissal . . . ." (Doc. No. 324 at 14.) While the motion for sanctions provided some notice that dismissal is possible, it is true that plaintiff and his counsel did not receive a *prior* warning that their conduct was sanctionable. *See Reyes*, 307 F.3d at 458 ("Although Claimant did not have a prior warning, the United States's motion to strike provided some notice.")

Generally, the absence of prior warnings that dismissal could result from a party's continued misconduct weighs against dismissal. *See Harmon*, 110 F.3d at 367 (internal citation and quotation omitted) (without prior notice, dismissal is usually inappropriate "unless the derelict party has engaged in bad faith or contumacious

---

[32] Plaintiff argues that laches is a personal defense, and that only Rio could have benefitted from the previously undisclosed evidence. *See Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir. 1984) ("[L]aches . . . is a personal defense which merely results in a loss of rights as against one defendant.") In *Odetics, Inc. v. Storage Tech. Corp.*, 919 F. Supp. 911 (E.D. Va. 1996), *vacated and remanded on other grounds*, 1997 U.S. App. LEXIS 22020 (Fed. Cir. 1997), the court held that the alleged infringer's customers were entitled to benefit from the defense because they had indemnity agreements with the alleged infringer. In rejecting the "personal defense" argument raised by the plaintiff, the court noted the inequitable possibility that, absent the extension of the defense to the alleged infringer's customers, the plaintiff "would be able to recover indirectly from [the alleged infringer] for infringement for which it is barred by laches from recovering [] directly." *Id.* at 926; *see also Artic Cat, Inc. v. Injection Rsh. Specialists, Inc*., 362 F. Supp. 2d 1113, 1127 (D. Minn. 2005) (laches extended to engine supplier, who was in privity with snowmobile manufacturer). While plaintiff makes much of the fact that *Odetics* and other cases involved situations where the other defendant was a customer, and not a seller, *Odetics* makes clear that, because laches is an equitable defense, it is the indemnity arrangement that requires the extension of the defense. *Odetics*, 919 F. Supp. at 925-26. It is undisputed that retail defendants have an indemnity agreement with Rio. (Doc. No. 325, Cohen Deposition, TR at 9826-9828.) Of course, even if the defense was not available to retail defendants, all defendants have still been prejudiced by the excessive delay that has been caused by the discovery abuse.

conduct"); *see*, *e.g.*, *Tetro v. Elliot Popham Pontiac*, *Oldsmobile*, *Buick and GMC Trucks*, 173 F.3d 988 (6th Cir. 1991) (lack of notice sufficient, in part, to reverse a district court's involuntary dismissal). However, the Sixth Circuit has emphasized that no one factor is dispositive. Therefore, prior warnings are not indispensable. *See Reyes*, 307 F.3d at 458; *see also Link*, *3*70 U.S. at 633 (the "absence of notice as to the possibility of dismissal" does not "necessarily render such a dismissal void"). Further, the Court has made specific findings that the misconduct of plaintiff and his counsel was willful and in bad faith, excusing the lack of prior warnings. *Cf. Stough v. Mayville Community Sch.*, 138 F.3d 612, 615 (6th Cir. 1998) (dismissal for failing to timely respond to summary judgment was too harsh where there was no prior warning that such conduct was subject to dismissal, and the district court made no finding of bad faith).

   Here, there was no opportunity or apparent need for the Court to provide a prior warning to plaintiff and his counsel, because the discovery misconduct was not discovered until years after the close of discovery and within weeks of trial. Of course, the Court does not believe it is necessary to warn a party that the offering of knowingly false deposition testimony or evasive discovery responses, or the concealment of highly relevant discovery, might compromise one's ability to continue to litigate in federal court. *See Freddie*, 428 F. App'x at 804 ("Once a witness swears to give truthful answers, there is no requirement to warn him not to commit perjury or, conversely to direct him to tell the truth.") (quoting *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1045 (10th Cir. 2005)); *see*, *e.g.*, *Archibeque v. Atchison*, 70 F.3d 1172, 1175 (10th Cir. 1995) (dismissal appropriate, notwithstanding a lack of notice that dismissal was imminent, where plaintiff

offered knowingly false deposition testimony). Still, the Court finds that the lack of a prior warning militates against dismissal.

### D.  Less Drastic Sanctions

In determining whether to dismiss a case due to a discovery violation, a district court should consider lesser sanctions. *Regional Refuse Sys.*, 842 F.2d at 155-56. In *Regional Refuse*, however, the Sixth Circuit noted that "[w]hile it would be inappropriate to dismiss without considering the severity of this sanction and the availability of lesser sanctions, it is not an abuse of discretion to dismiss, even though other sanctions might be workable, if dismissal is supportable on the facts." *Id.* at 155; *see also Tech. Recycling*, 186 F. App'x at 637 ("we have never held that a district court is without power to dismiss a complaint, as the first and only sanction") (quoting *Harmon*, 110 F.3d at 367).

At the conclusion of the sanctions hearing, the Court directed the parties to address the availability of less drastic sanctions in post-hearing briefs. Defendants insist that no sanction short of dismissal with attorney's fees and expenses can address the harm caused by plaintiff and his counsel. (Doc. No. 331 at 10256.) It is true that it is not possible to "un-ring the bell," or "turn back the clock" to a time before the present discovery abuse occurred. Still, the Court is cognizant of the fact that there is a preference in our system of justice to have actions decided on the merits and will, therefore, consider the possibility of lesser sanctions.

As a possible lesser sanction, plaintiff suggests that the Court take as established the following facts:

> Laukus learned of Rio Brands, Inc.'s use of the "American Pride" mark on flag products no later than June 1, 2004, when he went to Lowe's and purchased a Rio Brands, Inc. flag kit bearing the mark "American Pride."
>
> On June 1, 2004, after purchasing the aforementioned flag kit from Lowe's, Laukus contacted an attorney about Rio Brands, Inc.'s use of the "American Pride" mark on flag products.

(Doc. No. 330 at 10238.) Rule 37(b)(2)(A)(i) permits the sanction of "directing that the matters embraced in the order or other designated facts be taken as established for the purposes of the action, as the prevailing party claims[.]"

The Court finds this to be a wholly inadequate remedy. This sanction would do nothing more than place plaintiff in the position in which he would have been had he properly engaged in discovery. The documents themselves, which plaintiff and his counsel withheld for years, clearly establish the above-mentioned facts, and admitting these facts, in no way, serves to sanction plaintiff and his counsel for their egregious misconduct. If anything, such a sanction would serve to encourage litigants and counsel to take a chance and withhold potentially damaging evidence, knowing that the only repercussion would be that the facts that naturally flow from the withheld documents would have to be acknowledged if the discovery misconduct is uncovered.

Plaintiff alternatively suggests that discovery could be re-opened, limited to the issue of laches, and/or that the Court could afford defendants leave to re-file their motion for summary judgment on this subject. While plaintiff concedes that his own deposition should be taken, again, at his expense, he insists that any other depositions,

and the summary judgment motion that is to follow, should be at defendants' expense.[33] Such a result would not compensate defendants for the time and expense associated with litigating this action under false pretences for years. Essentially starting over with discovery and possible dispositive motions would also add further delay to a matter that has already been pending too long.

One lesser sanction, not offered by either side, comes closer to undoing the damage done by plaintiff and counsel—finding the issue of laches against plaintiff, and awarding attorney's fees associated with the motion for sanctions, the hearing, and summary judgment. Rule 37(b)(2)(ii) provides as a possible sanction "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[.]" Even this sanction, however, does not take into consideration the fact that Rio has shouldered the burden of financing its defense, as well as the indemnification of retail defendants, for years as the parties and this Court have traveled down a path contaminated by concealment and misdirection.[34] Nearly five years have passed, discovery has been taken and memories have faded, motions have been filed and ruled upon, and fees and costs have mounted. These realities cannot be altered and, having weighed the relevant factors, the Court finds that such a balancing disfavors this option.

The Court gave consideration to one final alternative sanction, and that

---

[33] Plaintiff's suggestion that he should not have to finance the re-taking of certain depositions because the individuals in question were not previously asked about the timing of laches, or that he should not have to pay for the deposition of individuals, such as Washington, DC counsel Delaney, because they were never deposed, is wholly disingenuous. It was because of plaintiff's misdirection and concealment that defendants did not pursue the topic of laches with these individuals.

[34] Rio is obligated to indemnify the retail defendants in this matter, and has represented that the costs of the litigation to date have exceeded 20% of Rio's net worth. (Doc. No. 331 at 10257.)

was to permit plaintiff's counterfeiting claim to go forward, with any possible damages and attorney's fees available only from the date that plaintiff's counsel belatedly produced the receipt, which was July 24, 2012. However, there would be little point to such an exercise as the record is clear that Rio ceased using the mark AMERICAN PRIDE by October 2007. (Doc. No. 84-1 at 997.) Moreover, given the clear record of "contumacious conduct," the Court may select dismissal as the appropriate sanction, even if other sanctions would have been available. *See Harmon*, 110 F.3d at 367-8 (further citations omitted). Any lesser sanction would fail to take into account the fact that the misconduct of plaintiff and his counsel has so completely tainted the proceedings that the parties and the Court would have to start this case over from the beginning. At this point, defendants are justified in treating all of plaintiff's submissions with skepticism, and will be forced to "attempt independent corroboration of each submission, at substantial expense of time and money," or else wonder whether any submission is accurate or complete. *Garcia v. Berkshire Life Ins. Co. of America*, 569 F.3d 1174, 1180 (10th Cir. 2009); *see Freddie*, 428 F. App'x at 804; *see also Universal Health Group*, 2013 U.S. App. LEXIS 58, at *7 ("Every violation of the Rules has consequences; the question is who will bear them. Too often the consequences are borne only by the innocent party, who must live with the violation . . . or else pay to brief and argue a motion to compel the offending party to do what the Rules required it to do all along.") (quoting *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 277-78 (6th Cir. 2010)). The Court, too, has serious doubts that this case could still be decided on the merits, as the integrity of the fact-finding process has been so severely compromised. *See Bratka*, 164 F.R.D. at 460. After all, "[t]here is no point to a lawsuit, if it merely applies law to lies." *Valley*

58

*Eng'rs*, 158 F.3d at 1058 ("True facts must be the foundation for any just result. Sometimes . . . a party's discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts.")

Of course, given the level of complicity by plaintiff's counsel, defendants would also be justified in treating as suspect every representation and decision made by plaintiff's counsel in this matter. The practice of law necessitates an honor system whereby attorneys are expected to meet their legal obligations in good faith, and to uphold both the letter and the spirit of the law that governs this noble profession. The practices employed by plaintiff's counsel, which were at certain times irresponsible and wholly lacking and at other times reprehensible, fell woefully short of this mark.

Additionally, the Court believes that any sanction short of dismissal would serve to diminish the seriousness of the discovery misconduct. "If primary responsibility for discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." Fed. R. Civ. P. 26(g) Advisory Committee Notes (1983 Amendment). When, as here, parties and their counsel willfully disregard their obligations to proceed in good faith, dismissal is warranted. *See Reyes*, 307 F.3d at 458 (affirming dismissal where plaintiff's counsel failed to fully respond to defendant's discovery requests); *see also Harmon*, 110 F.3d at 366-69 (same); *Fharmacy Records*, 379 F. App'x at 523 (affirming dismissal where "plaintiffs and their counsel had made numerous false statements" and "destroyed or hidden evidence"). While the Court does not arrive at this conclusion lightly, the facts of this case and the level and extent of misconduct demand dismissal. The Court also finds that the assessment of reasonable attorney's fees and expenses, associated with discovery and summary judgment on the

59

issue of laches (including all fees and expenses related to both depositions of plaintiff and the deposition of Martin), along with those fees and expenses incurred prosecuting the present motion, is proper.[35]

## V. CONCLUSION

Defendants' motion for sanctions is granted, as set forth in this Memorandum Opinion and Order. Plaintiff's claims are hereby dismissed with prejudice, and the Court awards defendants all of their attorney's fees and expenses incurred in discovery and summary judgment on the issue of laches, as well as fees and costs incurred prosecuting their motion for sanctions. The Court hereby grants defendants leave until March 25, 2013 to file an application for reasonable attorney's fees and expenses.

**IT IS SO ORDERED**.

Dated: March 11, 2013

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[35] Reasonable attorney's fees and expenses are available under Rule 16(f), Rule 26(g), Rule 37(b), and Rule 37(d). *See Eisler v. O'Connor*, No. 8903268, 1990 U.S. App. LEXIS 10019, at *3 ("Rule 16(f) authorizes the imposition of fees and expenses, '[i]n lieu of or in addition to any other sanction'") (quoting Fed. R. Civ. P. 16(f)); *Jackson v. Nissan Motor Corp*., No. 88-6132, 1989 U.S. App. LEXIS 16348, at *10 (6th Cir. Oct. 30, 1989) ("Rule 37(d) also authorizes the court to award attorney's fees and expenses resulting from one's failure to attend a deposition, answer interrogatories, or respond to a request for inspection."); *Washington v. City of Detroit*, Case No. 05-cv-72433, 2007 U.S. Dist. LEXIS 12100, at *5 (E.D. Mich. Feb. 22, 2007) (quoting Fed. R. Civ. P. 26(g) ("Rule 26(g) 'authorizes appropriate sanctions, including reasonable attorney's fees, if a party violates Rule 26 without substantial justification.'")). Rule 37(b)(2)(C) further provides: "Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." The Court shall interpret the phrases "caused by the failure" and "resulting from one's failure" conservatively and limit attorney's fees and costs to those that may be directly tied to the discovery abuse.